NORTHEAST OHIO REGIONAL SEWER DISTRICT, APPELLEE, *v.* TYLER, DIRECTOR, APPELLANT.

NORTHEAST OHIO REGIONAL SEWER DISTRICT, APPELLEE, *v.* TYLER, DIRECTOR, ET AL., APPELLEES; CITY OF DAYTON, APPELLANT.

(Nos. 86AP-495 and -593 — Decided September 11, 1986.)

*Squire, Sanders & Dempsey, J. Van Carson, George Von Mehren* and *Susan E. Flannery,* for appellee Northeast Ohio Regional Sewer District.

*Anthony J. Celebrezze, Jr.,* attorney general, *Terrence M. Fay* and *Margaret A. Malone,* for OEPA and Warren Tyler, Director.

*J. Anthony Sawyer,* city attorney, and *Arthur W. Harmon, Jr.,* for appellant city of Dayton.

*Ronald J. O'Brien,* city attorney, *Vorys, Sater, Seymour & Pease* and *John C. Klein; Robert H. Maynard,*

*John W. Huberg* and *Martyn T. Brodnick,* special counsel, for appellant city of Columbus.

McCormac, J. This case is on appeal from a decision of the Environmental Board of Review ("EBR") finding that Warren Tyler, Director of the Ohio Environmental Protection Agency ("OEPA") acted unlawfully in applying a twenty-percent cap to the Northeast Ohio Regional Sewer District ("NEORSD") construction grant application.

The Federal Water Pollution Control Amendments of 1972, the "Clean Water Act," authorize federal grants for the construction of state water treatment works. Pursuant to Section 1296, Title 33, U.S. Code, the states develop project priority systems ("PPS") wherein projects are accorded priority based on a number of factors. The projects are then ranked on a project priority list ("PPL"). Pursuant to Section 1282(a)(1), Title 33, U.S. Code, the federal share or grant amount is seventy-five percent of the cost of construction.

On May 10, 1985, OEPA issued its draft PPS and invited public comment. Section IV(D)(2) provided that:

"The administrative management tasks which the Ohio EPA may exercise, include, but are not limited to the following:
"* * *

"2. Limiting a project or grantee to one (1) grant per fiscal year or a maximum of 20% including amendments and I/A dollars, of the fiscal year's allocation after deducting reserves 2 through 6 identified on page 13. This dollar limit will be calculated at the beginning of the fiscal year."

In July 1985, OEPA sent its PPS to the United States Environmental Protection Agency ("USEPA"). On July 9, 1985, NEORSD, after having received a copy of the draft PPS, sent a letter of comment to OEPA.

NEORSD objected, *inter alia,* to Section IV(D)(2), the management strategy quoted above. On October 2, 1985, OEPA issued its final PPS for fiscal year 1986, and issued its draft PPL. The draft PPL was based on informal estimates of need, given by each grantee. Also on October 2, OEPA issued a special edition of "The Clarifier," a publication of the OEPA division of construction grants.

Two of NEORSD's projects were ranked first and third on the draft PPL. In first place was a segment of the Heights-Hilltop Interceptor (H-H contract No. 2[a]). In third place was a segment of the Southwest Interceptor (SWI contract No. 4). Both of these projects, H-H and SWI, are major sewage projects with estimated total construction costs of $187,000,000 and $142,000,000 respectively. Therefore, OEPA requested that NEORSD divide these projects into segments because the treatment works taken as a whole would otherwise have consumed a disproportionate share of Ohio's grant fund allocation. The segmenting of projects is contemplated by federal regulation. See Section 35.2108, Title 40, C.F.R. OEPA and NEORSD mutually agreed that H-H and SWI would be segmented into a number of smaller contracts or phases to be built in succession over several years. The determination of whether a project should be segmented to avoid consuming a disproportionate share is done when the project is initially proposed for facilities plan approval. It is not an annual event. In the instant case, this determination was made in September 1984. As noted, the segments to be completed for 1986 are H-H contract No. 2(a), for $14,675,411 and SWI contract No. 4, for $15,450,314.

The final PPS, Section IV(D)(2), provided:

"* * * [T]he Ohio EPA *may* exercise * * * the following:
"* * *

"2. Limiting a *project or grantee* to a maximum of 20% including amendments, of the fiscal year's allocation \* \* \*." (Emphasis added.)

On October 2, 1985, the exact amount of federal aid to Ohio was unknown. Therefore, at that time NEORSD could only make an intelligent guess as to whether it would be harmed by OEPA's possible application of the twenty-percent cap. NEORSD took several steps internally, recognizing the possibility that there could be a substantial shortfall in its 1986 allocation if the twenty-percent cap were imposed upon the amount then being considered by the federal authorities for allocation to Ohio.

On November 18, 1985, NEORSD formally petitioned OEPA for reconsideration of its final PPS. This petition was made pursuant to Section IV(E)(33) of the PPS, which provided:

"In accordance with 40 CFR 35.3030 (August 19, 1983) any construction grant applicant or grantee who feels they [*sic*] have been adversely affected by a State's action or omission may request a review of the State action by the USEPA, Region V. This regulation applies *to any function* which has been delegated to the State \* \* \*. However, prior to submitting a request to review a State decision to Region V, the grantee *must* petition the State for a reconsideration of the Initial State Decision. This process is a regulatory requirement and is intended to protect the applicant/grantee's reconsideration rights."

In its petition for reconsideration, NEORSD stated:

"\* \* \* In particular, the District petitions the Ohio EPA to reconsider Part IV.D.2 of the Priority Management System, insofar as it purports to limit the funds available to a project or a grantee to no more than 20% of the state's total allocation for the fiscal year. NEORSD submits that this limitation is in excess of Ohio EPA's statutory authority, contradicts federal law and congressional intent, and is arbitrary, capricious and an abuse of discretion."

On December 13, 1985, OEPA responded to NEORSD's request for reconsideration, holding that the reconsideration process was not applicable to the twenty-percent provision. OEPA also stated that the twenty-percent cap would be applied on a grantee, and not a project basis. OEPA did, however, offer the suggestion that should NEORSD choose, OEPA would be willing to negotiate a reduced project scope for H-H contract No. 2(a) and/or SWI contract No. 4 in order to facilitate federal participation in both projects. On December 19, 1985, President Reagan signed an appropriation bill in which Ohio was allocated only $33,000,000. This appropriation was later supplemented, according to information in briefs regarding a requested stay order, but the final amount would still result in a substantial shortfall to NEORSD if the twenty-percent cap were applied. Also on that date, OEPA issued its final PPL ranking the H-H segment as first and the SWI project as second. Subsequently, on January 13, 1986, NEORSD filed its notice of appeal to the EBR. The EBR permitted several parties to intervene in the action, including appellant, city of Columbus.

The EBR held both that it had jurisdiction over the appeal, *i.e.*, that the notice of appeal was timely filed, and that the twenty-percent cap provision was illegal. OEPA has appealed to this court, raising the following assignments of error:

"The Environmental Board of Review committed reversible error in refusing to dismiss NEORSD's appeal as untimely.

"(1) The October 2, 1985 issuance of the 20% cap was a final action of

Ohio EPA ripe for adjudication and review by the Environmental Board of Review when issued, and NEORSD had until thirty days after it received notice of such issuance to file its notice of appeal.

"(2) If this court finds that the issuance of the twenty-percent cap by Ohio EPA was not a justifiable action of the Director subject to immediate review, it should rule that no justiciable controversy with respect to the cap exists until its application, and vacate the EBR's decision in this matter.

"The EBR committed reversible error in holding that the 20% cap in Ohio's priority system is unlawful because neither the cap nor Ohio EPA's action in applying the cap is inconsistent with provisions of the Clean Water Act.

"(1) Ohio's authority to determine priority under Section 216 of the Clean Water Act extends to the imposition of a 20% cap.

"(2) The 75% Federal Share Provisions of Section 202 of the Clean Water Act relate to the costs of the project as described in the grant agreement not in the grantee's application."

The city of Columbus has also appealed, raising similar assignments of error. The only new argument raised by its brief is assignment of error number four:

"The Environmental Board of Review erred by not determining that NEORSD is estopped from challenging the construction grant cap."

In the first part of its first assignment of error, OEPA argues that the October 2, 1985 issuance of the twenty-percent cap was a final action of the OEPA and that, therefore, NEORSD's notice of appeal on January 13, 1986 was untimely. Pursuant to R.C. 3745.04, appeals to the EBR shall be filed within thirty days after notice of an "action" of the OEPA. The section goes on to define "action" or "act" as including the adoption, modification, or repeal of a rule or standard. Pursuant to R.C. 3745.05, the EBR's limited jurisdiction involves determining whether an action of the OEPA is unreasonable of unlawful. *Citizens Committee to Preserve Lake Logan* v. *Williams* (1977), 56 Ohio App. 2d 61, 69, 10 O.O. 3d 91, 96, 381 N.E. 2d 661, 666. "Unlawful" means that which is not in accordance with the law, and "unreasonable" means that which is not in accordance with reason or that which has no factual foundation. *Id.* at 70, 10 O.O. 3d at 96, 381 N.E. 2d at 667. Pursuant to R.C. 3745.06, this court must determine whether the order of the EBR is supported by reliable, probative and substantial evidence and is in accordance with law.

The EBR determined that, when OEPA announced the twenty-percent cap in early October 1985, there was no clear or final application of the cap to NEORSD. This court agrees with that determination for the following reasons. Even though the PPS was issued as "final" on October 2, 1985, the twenty-percent cap provision was termed in permissive language. If, for example, OEPA chose not to apply the twenty-percent cap or chose to apply the cap on a project rather than a grantee basis, NEORSD would have suffered no damage and had no right to appeal. Either result would have been fully consistent with the permissive language used in Section IV(D)(2) of the PPS. Furthermore, since the federal allocation of funds was not definite at this point, NEORSD could not accurately predict whether a twenty-percent cap would actually result in a shortfall. While that situation was very possible, NEORSD's appeal rights should not rest upon prediction. As the EBR noted, a justiciable controversy with respect to the lawfulness or reasonableness of an action by OEPA does

not exist "[u]ntil the parties can come forward with a specific factual setting, without strictly resorting to hypotheticals and speculation * * *." *White Consolidated Industries* v. *Nichols* (1984), 15 Ohio St. 3d 7, 9, 15 OBR 6, 8, 471 N.E. 2d 1375, 1377. OEPA argues, however, that in *White Consolidated,* the court relied on the fact that it could not say whether the rules at issue would ever be applied to the parties therein, whereas here, no doubt existed in October 1985 that NEORSD would seek grants in 1986 and that OEPA would apply the cap. However, there was doubt in October 1985 whether OEPA would apply the cap because the language used in the final PPS was permissive. The word "may" shall be construed as permissive and the word "shall" shall be construed as mandatory, unless there appears a clear and unequivocal legislative intent that they receive a construction other than their ordinary usage. *Dorrian* v. *Scioto Conserv. Dist.* (1971), 27 Ohio St. 2d 102, 56 O.O. 2d 58, 271 N.E. 2d 834, paragraph one of the syllabus. Therefore, OEPA's argument, that the October 2, 1985 issuance of the twenty-percent cap was a final action of OEPA, is rejected.

Alternatively, OEPA argues that no justiciable controversy as yet exists with respect to the twenty-percent cap. OEPA argues that this case will not become ripe for review until NEORSD's applications have been reviewed, an allowable cost determination has been made, and OEPA has offered awards to NEORSD in amounts less than seventy-five percent of the projects' costs. However, the evidence indicates that OEPA's letter of December 13, 1985, granting no further consideration of its decision to apply the twenty-percent cap, was a final action of the OEPA. Therefore, since NEORSD appealed within thirty days of December 13, its appeal was timely filed. In this letter, OEPA unequivocally stated that the twenty-percent cap would be applied; that it would be applied on a grantee basis during the fiscal year; that no further consideration of that decision would be given in that fiscal year; and that OEPA, as an alternative, would be willing to renegotiate a reduced project scope for NEORSD's segments, in order to facilitate federal participation in both projects. As the EBR noted, this was the first and final statement of what OEPA was planning insofar as OEPA's prior approved project grants were concerned.

OEPA also argues that, pursuant to *State, ex rel. Bd. of Edn.,* v. *State Bd. of Edn.* (1978), 53 Ohio St. 2d 173, 7 O.O. 3d 357, 373 N.E. 2d 1238, certiorari denied (1978), 439 U.S. 865, the act of refusing to change one's position is not equivalent to the act of deciding in the first instance which position to take among several alternatives. However, in the instant case, the December 13, 1985 letter represented more than a mere refusal of OEPA to change its position. As noted, the OEPA clearly stated its position on application of the twenty-percent cap on this date. Given this fact, and the fact that the broad definition of appealable "acts" contained in R.C. 3745.04 is to be liberally construed in favor of appeals to the EBR (see *Youngstown Sheet & Tube Co.* v. *Maynard* [1984], 22 Ohio App. 3d 3, 22 OBR 37, 488 N.E. 2d 220), OEPA's first assignment of error is overruled, along with the similar assignments of error by the city of Columbus.

In its second assignment of error, OEPA argues that the EBR committed error in holding that the twenty-percent cap was illegal. As previously noted, pursuant to Section 1296, Title 33, U.S. Code, the states are given the authority to develop priority systems and priority lists for the award of fed-

eral monies. Section 1282(a)(1), Title 33, U.S. Code, provides, in part:

"(1) The amount of any grant for treatment works made under this Act from funds authorized for any fiscal year beginning after June 30, 1971, and ending before October 1, 1984, shall be 75 per centum of the cost of construction thereof (as approved by the Administrator), and for any fiscal year beginning on or after October 1, 1984, shall be 55 per centum of the cost of construction thereof (as approved by the Administrator), *unless modified to a lower percentage rate uniform throughout a State by the Governor of that State* with the concurrence of the Administrator. * * * Notwithstanding the first sentence of this paragraph, *in any case where a * * * waste treatment facility * * * has received a grant for erection * * * before October 1, 1984, all segments and phases of such facility * * * shall be eligible for grants at 75 per centum of the cost of construction thereof.*" (Emphasis added.)

The last sentence of this section is known as the "grandfather clause." NEORSD's two projects for fiscal year 1986, H-H contract No. 2(a) and SWI contract No. 4, fall under this clause, and are thus eligible for seventy-five percent funding. Pursuant to Section 1285(d), Title 33, U.S. Code, sums allocated to the states for a fiscal year remain available for only two years. See, also, Section 35.2010, Title 40, C.F.R.

These federal statutes are implemented by federal regulation in Section 35.2000 *et seq.*, Title 40, C.F.R. Section 35.2015(a), Title 40, C.F.R. provides, in part:

"* * * The Regional Administrator will award grant assistance from annual allotments to projects on a State project priority list developed in accordance with an approved State priority system. The State priority system and list must be designed to achieve optimum water quality management *consistent with the goals and requirements of the Act. * * *"* (Emphasis added.)

Section 35.2015(c)(1) provides:

"(1) The State shall develop the project priority list consistent with the criteria established in the approved priority system. In ranking projects, the State *must also consider total funds available*, needs and priorities set forth in areawide water quality management plans, and any other factors contained in the State priority system." (Emphasis added.)

Section 35.2108 discusses phased or segmented treatment works. It provides, in part:

"Grant funding may be awarded for a phase or segment of a treatment works, * * * provided:

"(a) The grant agreement requires the recipient to make the treatment works of which the phase or segment is a part operational and comply with the enforceable requirements of the Act according to a schedule specified in the grant agreement regardless of whether grant funding is available for the remaining phases and segments; and

"(b) Except in the case of a grant solely for the acquisition of eligible real property, one or more of the following conditions exist:

"(1) The Federal share of the cost of building the treatment works would require a disproportionate share of the State's annual allotment relative to other needs or would require a major portion of the State's annual allotment;

"(2) The period to complete the building of the treatment works will cover three years or more; [or]

"(3) The treatment works must be phased or segmented to meet the requirements of a Federal or State court order * * *."

Section 35.2152(a) provides, in part, that:

"* * * Except as provided elsewhere in this section, the Federal share shall be:

"* * *

"(3) Subject to paragraph (c) of this section, 75 percent for grant assistance awarded after September 30, 1984, for sequential phases or segments of a primary, secondary, or advanced treatment facility or its interceptors, or infiltration/inflow correction provided:

"(i) The treatment works being phased or segmented is described in a facilities plan approved by the Regional Administrator before October 1, 1984;

"(ii) The Step 3 grant for the initial phase or segment of the treatment works * * * is awarded prior to October 1, 1984; and

"(iii) The phase or segment that receives 75 percent funding is necessary to (A) make a phase or segment previously funded by EPA operational and comply with the enforceable requirements of the Act, or (B) complete the treatment works referenced in (a)(3)(i) of this section provided that all phases or segments previously funded by EPA are operational and comply with the enforceable requirements of the Act."

Thus, grandfathered projects are funded at seventy-five percent.

OEPA first argues that Ohio's authority to determine priority under Section 216 of the Clean Water Act (Section 1296, Title 33, U.S. Code) extends to the imposition of a twenty-percent cap. OEPA argues that given the state's authority to develop a PPS, the twenty-percent cap, as a part thereof, cannot merely be excised from this system. While the state has authority to develop a PPS pursuant to Section 1296, and while it is understandable for the state to attempt to apply a twenty-percent cap given the limited federal funds available, nevertheless, the state cannot develop a PPS which violates federal law. Section 1282 provides that the federal share shall be seventy-five percent. The only instance in which a project can be funded at a lower percent is when the state's governor uniformly lowers the percentage rate. See *Rockaway Valley Regional Sewerage Auth.* v. *New Jersey Dept. of Environmental Protection* (1984), 194 N.J. Super. 52, 476 A. 2d 281. In the instant case, the Governor of Ohio refused to uniformly lower the federal share.

While the total funding and a comparison of the water quality benefit to the cost of construction is a proper and even mandatory consideration in the development of a ranking system, it may not be arbitrarily implemented separately so that eligible projects are accorded funding below the mandatory percentage. If the percentage of funding is to be reduced, it must be uniformly reduced by act of the Governor. It is equally arbitrary to order at the end of the process an arbitrary reduction of the cost of a segment of a project to fit the twenty-percent cap. That power would emasculate the uniform funding provisions.

OEPA next argues that the seventy-five percent federal share provisions of Section 202 of the Clean Water Act (Section 1282, Title 33, U.S. Code) relate to the costs of the project as described in the grant agreement, not in the grantee's application. In essence, OEPA argues that neither a prior decision that a treatment works will be segmented, nor the development of the requisite schedules, can be regarded as having effectively determined the project or grant scope for future grants. We disagree.

Both the H-H and SWI projects were segmented based on the mutual agreement of OEPA and NEORSD.

Schedules were developed listing specific contracts, with dates of initiation and completion and estimated costs. OEPA cannot renegotiate the size of these segments, having previously agreed to segment the project. As the EBR found, once a treatment works has been segmented, Section 35.2108, Title 40, C.F.R. does not permit grant funding at less than seventy-five percent of the construction costs for the segments so established. We agree with NEORSD's contention that OEPA's interpretation of Section 1296 renders Section 1282 meaningless. Therefore, OEPA's second assignment of error is overruled, as are similar assignments of error by the city of Columbus.

In its assignment of error four, the city of Columbus argues that EBR erred by not determining that NEORSD was estopped from challenging the construction grant cap. In essence, Columbus argues that NEORSD's acceptance of the construction grant cap in previous years prevented it from challenging the 1986 cap. The facts reveal that OEPA had previously applied caps of thirty and twenty-five percent to its allocation of federal funds. Columbus' argument is without merit. NEORSD would not have had standing to challenge the caps in previous years because, in previous years, the caps did *not* violate the seventy-five percent funding provision of Section 1282. Thus, NEORSD would *not* have been able to show injury in fact, a requirement for standing. *Assn. of Data Processing Serv. Org., Inc.* v. *Camp* (1970), 397 U.S. 150. Therefore, the city of Columbus' assignment of error number four is overruled.

Pursuant to Section 35.2015(c)(1), Title 40, C.F.R., cited previously, the state *must* consider the total funds available in developing its project priority list. Thus, the proper place for OEPA's concerns with regard to limited federal funding is in the actual ranking of the projects in Ohio. The total funds available must be considered prior to ranking. Then, the seventy-five percent federal share is applied to the projects in the listed order.

The OEPA was required to consider the total funds available in ranking projects. However, as noted in this opinion, allocation of total funds available was considered, not as part of the ranking process, but as an unlawful cap upon funds available to projects otherwise entitled to seventy-five percent funding. The result of simply eliminating the cap would be to end up with a project priority list that does not take into account one of the mandatory factors. Hence, EBR's order should be modified to a remand to OEPA to revise its PPS, including the factor of the total funds available, and thereafter to re-rank the projects according to the revised formula.

Based on the above, appellants' assignments of error are overruled, and the order of the Environmental Board of Review is affirmed as modified. The cause is remanded to the Director of the OEPA for proceedings consistent with this opinion, and OEPA's motion for stay is overruled.

*Motion for stay overruled;*
*judgment affirmed as modified.*

STRAUSBAUGH and TYACK, JJ., concur.